IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

04  10149 JLT

MAGISTRATE JUDGE Bowler

BOURNEWOOD HOSPITAL
300 South Street
Brookline, MA 02467

Plaintiff,

v.

TOMMY G. THOMPSON, in his official
capacity as Secretary, United States
Department of Health and Human Services,
200 Independence Avenue, S.W.,
Washington, D.C. 20201

Defendant.

Civil Action No. _____

## COMPLAINT

1.  This is an action for judicial review of a final decision of the Centers for Medicare and Medicaid Services ("CMS") acting pursuant to a delegation of authority from the Secretary ("Secretary") of the United States Department of Health and Human Services ("HHS"). The case below was a consolidated Medicare administrative appeal arising out of Medicare cost reports filed on behalf of Bournewood Hospital ("Bournewood") for its fiscal years 1997, 1998 and 1999. The appeals were brought before the Provider Reimbursement Review Board ("PRRB" or "Board"), a five-person board within CMS that decides Medicare reimbursement disputes between providers of services (such as hospitals) and the Medicare program. The consolidated cases were all captioned <u>Bournewood Hospital v. Blue Cross Blue Shield Association/Associated Hospital Service of Maine</u>, and were numbered PRRB Case No. 99-3609, PRRB Case No. 00-3050 and PRRB Case No. 01-2972.

BOS1343940.3

2. A decision by the PRRB adverse to Bournewood was rendered on November 21, 2003 and received by counsel for Plaintiff on November 25, 2003. This action for judicial review is filed within 60 days of such receipt, as required by 42 U.S.C. § 1395oo(f)(1).

3. The issue in this appeal is whether Bournewood provided adequate documentation of the costs it incurred in meeting a state licensure requirement that there be a physician on the hospital premises at all times.

## THE PARTIES

4. Plaintiff Bournewood Hospital is a for-profit corporation with a principal place of business at 300 South Street, Brookline, Massachusetts, 02467.

5. Defendant Tommy G. Thompson, named herein in his official capacity as the Secretary of HHS, an agency of the United States Government, is responsible for administering the Medicare program. CMS is the operating component of HHS charged with the administration of Medicare.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1395oo(f)(1). This Complaint is an action for judicial review of a final administrative decision of the Secretary. The amount in controversy in this action exceeds $50,000 in the aggregate. Plaintiff also is entitled to judicial review in this matter pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., including without limitation 5 U.S.C. §§ 703, 704 and 706; and the Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202.

7. Venue in this district is proper under 42 U.S.C. § 1395oo(f), 28 U.S.C. § 1391 (b) and (e), and 5 U.S.C. § 703.

## **LEGAL BACKGROUND**

8.  The Medicare program was established in 1965 under Title XVIII of the Social Security Act (the "Act") to provide health insurance to the aged and disabled. CMS is the operating component of the Department of Health and Human Services charged with administering the Medicare program. The Medicare statutes are codified at 42 U.S.C. § 1395 et. seq.

9.  The Social Security Amendment of 1965 established two insurance programs: the Hospital Insurance Program, which is governed by the statutory provisions of Part A of Title XVIII, 42 U.S.C §§ 1395c-1395i, and the Supplementary Medical Insurance Program, which is governed by Part B of Title XVIII, 42 U.S.C §§ 1395j-1395w.

10. Under Part A, beneficiaries are eligible to have certain covered provider services reimbursed, including inpatient hospital services, as specified in § 1395d of the Act. Section 1395f requires that the Medicare program pay providers for Part A services an amount that is the lesser of the provider's customary charges for those services or the reasonable costs of those services.

11. Under Part B, beneficiaries are eligible to have medical and other health services reimbursed which have been furnished to them as specified in § 1395d of the Act. The definition of "medical and other health services" in § 1395x(s) includes, inter alia, outpatient hospital services and "physician's services." Section 1395x(q) of the Act defines "physicians' services" as professional services performed by physicians as defined in § 1395x(r), including surgery, consultant, and home, office and institutional calls, but excluding services furnished by interns and residents "under a teaching program" as described at § 1395x(b)(6). Part B physician

services personally rendered for individual patients are paid on a reasonable charge basis from the Medicare Part B Trust Fund.

12. The Secretary's payment and audit functions under the Medicare program are contracted out to insurance companies known as fiscal intermediaries. Fiscal intermediaries determine payment amounts due the providers under the Medicare law and under interpretative guidelines published by CMS.

13. At the close of its fiscal year, a provider must submit a cost report to the fiscal intermediary showing the costs it incurs during the fiscal year and what proportion of those costs are to be allocated to Medicare. 42 C.F.R. § 413.20. The fiscal intermediary audits the cost reports and determines the total amount of Medicare reimbursement due the provider, which it publishes in a notice of program reimbursement ("NPR"). The NPR sets forth the individual expenses allowed and disallowed by the intermediary. 42 C.F.R. § 405.1803. A provider dissatisfied with the intermediary's final determination of total reimbursement may file an appeal with the PRRB within 180 days of the NPR. 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835.

14. As a so-called PPS-exempt psychiatric hospital, Bournewood is reimbursed on a reasonable cost basis. 42 C.F.R. §§ 412.22(b), 412.23. Under the reasonable cost reimbursement method a provider is reimbursed for "all necessary and proper costs incurred in furnishing [health] services," to Medicare beneficiaries. 42 C.F.R. § 413.9(a). "Reasonable cost" is defined as "the cost incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v). The Medicare statute directs the Secretary to promulgate regulations providing for reimbursement on a reasonable cost basis, taking into account the direct and indirect costs to providers necessary for the efficient delivery of health care services. 42 U.S.C. § 1395x(v)(1)(A), 42 C.F.R. § 413.9(b)(1).

15.     "Necessary and proper costs" are defined in the regulations to include "costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities." 42 C.F.R. § 413.9(b)(2). The regulations further clarify that "necessary and proper costs" are costs that are usual, common and accepted in the provider's field of service, id., and provide examples of allowable costs including: (i) administrative costs; (ii) maintenance costs; and (iii) premium payments for employee health and pension plans. 42 C.F.R. § 413.9(c)(3). More generally, reasonable costs include both indirect and direct costs and normal standby costs. Id. The reasonable cost methodology is intended to reimburse providers for the "actual costs of providing quality care however widely the actual costs may vary from provider to provider and from time to time for the same provider." 42 C.F.R. § 413.9(c)(3).

16.     Applicable regulations of the Massachusetts Department of Mental Health ("DMH") require any hospital licensed by it to comply with the staffing requirements of the DMH. The staffing requirements for DMH licensure provide that a hospital must have a physician on the premises at all times. 104 C.M.R. § 2.04(8)(b).

17.     Medicare recognizes "physician availability costs" as allowable costs under appropriate circumstances. For example, in the context of hospital emergency departments, physician availability services consist of the physician's presence in a health care facility, under an arrangement with the hospital, to render emergency treatment to patients when needed. See 42 C.F.R. § 415.55(a)(2). Provider Reimbursement Manual, Part I, § 2109.2. Medicare policy recognizes that the nature of "emergency services" results in down time for physicians during which they are on the premises but are not providing services and are not, therefore, generating revenue. In recognition of the sporadic utilization of hospital emergency department services,

Medicare reimburses providers for reasonable costs of physician availability in emergency departments. See Provider Reimbursement Manual, Part I, § 2109.

18. Costs associated with continuous physician presence at a psychiatric hospital constitute reasonable (i.e., necessary and proper) costs. Psychiatric hospitals in Massachusetts have no discretion to decide whether to provide continuous physician on-site presence. In order to be licensed in the Commonwealth of Massachusetts as a mental health facility of the same type as the Hospital, a facility "shall have a physician . . . on the premises at all times." 104 C.M.R. § 2.04(8)(b). Medicare requires, as a condition of program participation, that a psychiatric hospital be licensed by the state. See 42 C.F.R. § 482.11. Thus, these costs are a necessary part, and a proper part of providing psychiatric services to Medicare beneficiaries in Massachusetts.

19. Similarly, usual, common and accepted costs in the provider's field of service, are allowable costs. 42 C.F.R. §413.9 (b)(2). Any provider in Bournewood's field of service operating within the Commonwealth of Massachusetts, must incur physician availability costs to maintain a license to operate in the "field of service." The costs are not only usual, common and accepted, they are mandatory. The purpose of the reasonable cost reimbursement method — to ensure that providers are reimbursed for the actual costs of providing care — weighs in favor of allowing physician availability costs in this context, because it is undeniable that costs incurred to maintain a license are actual costs of providing care.

## FACTS

20. Bournewood operates a 90-bed PPS-exempt psychiatric hospital. In order to comply with the requirements of the DMH licensure regulation, Bournewood was required to have a physician on its premises at all times ("Physician on Premises" or "POP"), meaning that

the physician had to be physically present and available at the facility at all times. It would not have been sufficient for a physician to be available "on call" at any location other than on the premises, no matter how proximate that location might be to the hospital.

21. The mandatory provision of applicable state licensure regulations that required Bournewood to have a physician on premises at all times was intended to assure physician availability to provide emergency services, if needed, to:

   (a)   patients who came to the hospital seeking services - - including to be admitted voluntarily or involuntarily - - at any time of the day and night;

   (b)   patients who experienced a medical emergency, whether or not accompanied by a psychiatric emergency; and

   (c)   patients who experienced a psychiatric emergency, including the need for seclusion and/or imposition of physical or chemical forms of restraint.

22. During its fiscal years 1997, 1998 and 1999, Bournewood Hospital consistently met the requirement that a physician be on the premises at all times to provide emergency services as the need arose. It did so in two ways, one applicable to normal daytime operating hours and one applicable to evenings, nights, weekends and holidays.

23. During normal daytime operating hours, physicians routinely were on the Hospital's premises for various reasons, such as providing therapy or engaging in administrative roles. Bournewood Hospital had a formal system under which, during normal daytime operating hours, one of those physicians was assigned to fulfill the responsibility of Physician on Premises. That physician was not permitted to leave the Hospital premises unless he/she signed out to another physician on the premises who assumed the role and responsibilities of Physician on Premises in his/her stead. Bournewood did not compensate its affiliated physicians for acting as Physician on Premises during normal daytime operating hours and no costs were claimed on the Medicare cost report for Physician on Premises services during those times.

24. During the evening and at night, and on weekends and holidays (*i.e.,* outside of normal daytime operating hours), the Hospital engaged physicians to be present at the facility and fulfill the duties and responsibilities of the Physician on Premises on a shift basis. Those physicians were selected and engaged based upon a series of criteria that included: competence and quality, availability, and economy. Among other things, physicians engaged to fulfill the role of Physician on Premises were required to have full medical licensure status and to present documentation of their authority to practice medicine and prescribe drugs in Massachusetts, as well as their professional liability coverage. Each applicant's medical and psychiatric experience was also reviewed. Physicians participating in the Boston area's psychiatric residency programs provided the most promising pool of physicians to recruit for this role at a reasonable cost.

25. The duties of the Physician on Premises during evening/night and weekend/holiday shifts were to remain on the premises at all times during the shift and to render, as needed, the following services of an emergency nature:

    (a)    to perform emergency services, psychiatric triage and psychiatric evaluations on patients presenting for admission, whether on a voluntary or involuntarily basis;

    (b)    to perform emergency psychiatric evaluations within 2 hours of admission to the Hospital, as required by DMH, of any patient admitted to the Hospital, especially for so-called "Section 12" patients who were sent to Bournewood Hospital from other facilities, including acute care hospital emergency rooms (*i.e.,* patients determined and documented by a psychiatrist pursuant to Massachusetts General Laws c. 123 §12 to be a danger to her/himself or others, but who refuses to be admitted voluntarily to an appropriate facility);

    (c)    to provide other emergency services with regard to ordering and monitoring restraint and/or seclusion, as needed, and to maintain compliance with the requirement of the DMH, the Medicare Program's Conditions of Participation and the JCAHO regarding timely intervention and ongoing supervision of these kinds of emergency situations;

    (d)    to respond to other emergent and urgent medical/psychiatric needs of inpatients;

(e)  to assess any patients wishing to leave the facility against medical advice, including to determine whether they are subject to Section 12 status.

26.  During the period FYs 1997-1999, the local competitive market for physicians qualified to perform the role of Physician on Premises during evening/night and weekend/holiday shifts was very tight and Bournewood Hospital experienced serious difficulties securing an adequate number of physicians to perform this role. At least three factors contributed to this difficulty: (a) competition with other psychiatric hospitals licensed by the Massachusetts Department of Mental Health that were seeking to comply with the same requirement in a similar way; (b) competition with other moonlighting opportunities available at acute care hospitals; and (c) a reduction in the overall number of physicians enrolled in area psychiatric training programs. Given the tight labor market, Bournewood needed to give careful consideration to whether it was offering competitive compensation for the post. In the face of the competitive pressures, Bournewood carefully designed a compensation system that was designed to be as economical as possible while still allowing recruitment of the necessary physicians to provide evening/night and weekend/holiday Physician on Premises services to the Hospital.

27.  The costs that were disallowed on audit and denied by the PRRB relate exclusively to the costs of physicians who provided on-site physical presence to satisfy DMH requirements that there be a physician continuously available to provide emergency services as need arose during the evening and night, on weekends an holidays, namely: Monday through Friday (non-holidays) during the hours 6:00 p.m. to 8:00 a.m.; Saturday and Sunday during the hours 8:00 a.m. to 8:00 a.m.; and holidays during the hours 8:00 a.m. to 8:00 a.m.

28.  The after-hours Physician on Premises personnel of Bournewood Hospital were compensated as follows during FYs 1997, 1998 and 1999: Physicians were paid a base rate of $385 for a 14-hour non-holiday shift on Monday through Friday. They were paid $660 for a 24-hour shift on weekends and holidays, except that they were paid $770 per shift for the three major holidays (*i.e.*, Christmas, New Years, and Thanksgiving). For other holidays (*i.e.*, Easter Sunday, Memorial Day, Fourth of July, etc.), the base pay rate was that of a regular weekend, or $660 per 24-hour shift. The base pay was paid to the POP to secure his/her continuous stand-by availability on the hospital premises to provide emergency services as need arose. Bournewood also provided the Physician on Premises a modest furnished room in a building on the premises for the period while he or she was performing that role during evening/night and weekend/holiday shifts.

29.  With respect to the standard 14-hour overnight shift that was paid at a base rate of $385, the hourly rate equivalent was $27.50 per hour. With respect to the standard 24-hour weekend shift, the hourly rate equivalent was $27.50 per hour. For the standard three holiday 24-hour shifts, the hourly rate equivalent was $32.08 per hour. Bournewood's total average hourly compensation rate to after-hours POPs after including an additional workload-related payment for shifts with an above average workload (described below) was $37.04 in FY 1997, $38.94 in FY 1998 and $41.67 in FY 1999.

30.  The above-described base pay rates were in effect during all three years under appeal, without any inflation or increase from year to year. Bournewood carefully controlled its POP costs to be competitive. Bournewood's compensation to its POPs was below the applicable Medicare Reasonable Compensation Equivalent ("RCE") in each year. In each of FYs 1997, 1998 and 1999 the Medicare RCE was $133,400 for a full-time equivalent ("FTE") physician.

Since an FTE is calculated at 2080 hours per year (i.e., 40 hours/week, for 52 weeks) the Medicare RCE allows an hourly pay rate of $64.13.

31.    In addition to the base pay, physicians were paid an additional workload-based payment if the shift the POP served required more than a standard amount of effort. The metric for measuring whether the shift has involved a heavier than standard workload was whether the POP had to complete more than two physicals per shift and whether that excess workload had occurred prior to or after midnight. Thus, Bournewood paid, in addition to the base shift pay, an added workload-related payment that was measured by multiplying the number of excess physicals performed prior to midnight by $25, and the number of post-midnight excess physicals by $50.

32.    By structuring the POP's compensation as it did (*i.e.*, by paying a base rate plus a workload-related additional amount), Bournewood found it could (a) appropriately compensate those physicians whose shifts had been busier than others; (b) provide the POP an incentive to complete and appropriately document patient physicals; and (c) ensure that aggregate physician compensation per shift was competitive with the marketplace, which enabled the Hospital to retain and recruit qualified physicians. This compensation structure was scaled so that the compensation paid to POPs would, in the aggregate between base pay and the workload-based additional amount, compensate the POP physicians competitively, but conservatively, for providing on-premises availability services to meet DMH requirements and provide emergency services.

33.    The after-hours Physician on Premises was not paid anything additional beyond the base pay plus, when indicated, the $25/$50 excess workload payment for providing availability to render any and all services that might turn out to be required during the

physician's shift. Bournewood did not provide these physicians any fringe benefits, such as health insurance, life insurance, disability insurance, paid time off, or malpractice insurance. The POP physicians were, as a condition of employment, required to provide evidence of their own malpractice insurance.

34.  The POP physicians were W-2 employees of Bournewood Hospital. As W-2 employees of Bournewood, the terms of their employment were governed by a written Employee Manual and written Policies and Procedures of Bournewood Hospital. The POP physicians were credentialed on the Medical Staff of Bournewood Hospital and were subject by written agreement to the Medical Staff Bylaws and Rules and Regulations.

35.  Under the terms of their employment as POPs, the physicians were not separately compensated by Bournewood for any Part B patient services they performed during their shifts. The POPs retained the right to bill Medicare for any Part B services they rendered (i.e., the POPs did not reassign to Bournewood their right to bill and collect for any such Part B services). The only costs Bournewood reported in its cost reports were the above-described base pay and excess workload payments measured on a per-physical basis that it made to hire physicians to provide after-hours POP availability services and stand-by on premises to provide emergency services.

36.  All of the physician compensation paid by Bournewood was Part A costs because they all related to the provision of "availability" services to patients who were admitted to Bournewood after being seen by the Physician on Premises in the emergency admitting area or were already inpatients of Bournewood. Under the Medicare rules, all of the services provided in an emergency setting to a patient who is admitted to the hospital are rolled up into and included in a hospital's Part A costs. Unlike an acute care hospital that maintains a formal emergency room that treats both patients who are admitted to the hospital (i.e., emergency visits

that are rolled up into Part A) and ambulatory patients who do not require hospitalization after emergency services are provided (i.e., emergency visits that are Part B outpatient services), Bournewood did not operate a formal emergency room. Instead, Bournewood's POPs were retained to be available to perform emergency services psychiatric triage and psychiatric evaluations on patients who were presenting for admission. Thus the physician availability costs Bournewood incurred were all related Part A of the Medicare program. Furthermore, the duties of Bournewood's POPs did not involve any services (such as management, administration or teaching) for which Medicare rules require an allocation of costs between Part A and Part B.

37.     Bournewood did not bill, and did not have the right to bill, Medicare for any Part B services provided by POPs. The POPs retained the right to bill Medicare for any Part B services they rendered (i.e., the POPs did not reassign to Bournewood their right to bill and collect for any Part B services). However, because of the administrative burdens that would have been involved and limited amount that was anticipated to be recoverable, as well as the non-competitiveness of such an alternative, Bournewood determined that it would not structure its compensation to POPs as a "minimum guarantee" of their potential Part B collections. While not material to the question of whether the costs that Bournewood incurred for Part A availability services are reimbursable, Bournewood believes that the Medicare program did not even pay the POPs for the Part B services they rendered during their shifts. All but a handful of the physicians retained to perform after-hours POP services were in residency and fellowship training programs in the Boston area, over 90% of them had not yet applied for Medicare UPIN provider billing numbers and did not retain billing services and, therefore, as a purely practical matter, they could not bill Medicare for the Part B services the rendered and for which they retained the right to bill.

BOS1343940.3

13

38. Bournewood monitored the competitiveness of the compensation it provided to physicians to perform the role of Physician on Premises in various ways. Bournewood's Human Resources Department monitored turnover, recruitment, and retention for all departments and positions throughout the Hospital, including the POP position. This process included exit conferences with staff that left the Hospital. If these monitoring and related exit conference data indicated an inability to retain and recruit POP staff, or the ability to hire too readily, compensation, among other factors, would be reviewed and assessed. Accordingly, Bournewood continuously monitored the alternatives available for its compensation arrangements with POP physicians. Bournewood concluded that the most cost-effective and competitive compensation arrangement was the arrangement it had in place during these years (*i.e.*, to pay on a per-shift basis as it did for the stand-by availability services of the POP physicians, rather than for example, to enter into more complex and non-competitive minimum guaranty payment arrangements).

39. Bournewood's target for where on the continuum that its compensation should rate (*i.e.*, high, low or in the middle) as compared to the compensation offered by competitors to candidate physicians to fill the POP role was to keep its wage and salary scale structured toward the mean of the marketplace. Bournewood successfully met that target.

40. Bournewood has maintained detailed auditable records of record of all payments made, physicians employed, and time on shifts covered provided by the POP physicians to support the costs reported for this item on its Medicare cost reports for FYs 1997, 1998 and 1999. The compensation costs for after-hours POP staffing were recorded in a separate and specific cost category in the Hospital's general ledger, which is a properly maintained and auditable financial record of Bournewood.

41. Bournewood's fiscal year 1997, 1998 and 1999 (FYE August 31) cost reports, submitted to its fiscal intermediary, Blue Cross Blue Shield Association/Associated Hospital Service of Maine ("the FI"), included the costs related to retaining the POPs. In its audit adjustment reports, the FI disallowed those "availability costs." The FI's only stated reason for denying the physician availability costs was that such costs are reimbursed only in connection with physicians in a hospital emergency department.

42. Appeals of the FI's denial of reimbursement for costs incurred in connection with the Physicians on Premises licensure requirement were brought before the PRRB under the captions Bournewood Hospital v. Blue Cross Blue Shield Association/Associated Hospital Service of Maine, PRRB Case No. 99-3609, PRRB Case No. 00-3050 and PRRB Case No. 01-2972. During the course of Bournewood's appeal, in a position paper dated April 9, 2002, the FI for the first time took the position that Bournewood's costs associated with complying with the licensure requirement were not reimbursable because they had not been properly documented.

43. By agreement of the parties, the PRRB decided the consolidated appeals without a hearing, based on the preliminary and final position papers, affidavits and 64 exhibits submitted by the parties that established the facts set forth in paragraphs 20 through 40 above.

44. The decision by the PRRB (Decision No. 2004-D2) was rendered on November 21, 2003. The PRRB denied Bournewood's appeal. The Board found, first of all, that the necessity for a psychiatric hospital licensed in Massachusetts to render emergency treatment as and when needed is the same function for which CMS authorizes reimbursement by Medicare for services in an acute care emergency room setting, and that therefore the costs associated with that function were reimbursable. It also found, however, that certain of the costs for which Bournewood was claiming reimbursement were Part B costs, rather than Part A costs, and that

Bournewood had not provided required documentation with its cost reports to allow the FI to differentiate between the two. The Board therefore denied Bournewood any reimbursement for the costs incurred in complying with the licensure requirement and assuring physician availability for emergencies.

45.     The Board's decision was received by counsel for Bournewood on November 25, 2003. A copy of the Board's decision is attached to this Complaint. On January 20, 2004, Bournewood's counsel was notified that the CMS Administrator would not be exercising its authority to review the Board's decision.

46.     The Board's decision is the final determination of the Secretary, reviewable pursuant to 42 U.S.C. § 1395oo(f).

## STATEMENT OF CLAIMS FOR RELIEF

## COUNT ONE

47.     The allegations contained in paragraphs 1 through 68 are realleged and incorporated by reference herein.

48.     As described above, the decision of the Secretary is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; is unsupported by substantial evidence; and otherwise must be reversed and set aside pursuant to 5 U.S.C. § 706 because it relies on an erroneous finding that Part B Medicare costs were included in the costs for which Bournewood was seeking reimbursement in its cost reports for FYs 1997, 1998 and 1999 and in its PRRB appeals, when the evidence showed that all of the costs associated with complying with the licensure requirement and providing physician availability for emergencies were Part A costs and that that fact was adequately documented by Bournewood.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs accordingly pray that this Court enter an order and judgment:

i. Finding and declaring that the Board's decision is arbitrary, capricious, contrary to law, unsupported by substantial evidence, and otherwise invalid under the Administrative Procedure Act, and reversing and setting aside such decision;

ii Finding and declaring that Bournewood was entitled to reimbursement for all of the costs it incurred in complying with the state licensure requirement that it have a physician on its premises at all times;

iii. Awarding Bournewood interest in accordance with 42 C.F.R. § 405.378 from the date of the Notices of Program Reimbursement for their fiscal years ending 1997, 1998 and 1999;

viii. Awarding Bournewood its costs and reasonable attorneys' fees; and

ix. Awarding such other relief as may be warranted at law or in equity.

Respectfully submitted,

NIXON PEABODY LLP

By: _____
Carolyn Jacoby Gabbay (#249700)
Gordon M. Jones, III (#549016)
Nixon Peabody LLP
101 Federal Street
Boston, MA 02110
Tele: (617) 345-1000
Fax: (617) 345-1300

Dated: January 23, 2004